Filed 6/4/14  In re J.S. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

<table>
<tr><td>

In re J.S. et al., Persons Coming Under the Juvenile Court Law.

SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,

       Plaintiff and Respondent,

       v.

Z.B.,

       Defendant and Appellant.

</td><td>

D065096

(Super. Ct. No. EJ3154D-E)

</td></tr>
</table>

APPEAL from orders of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Terence M. Chucas, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minors.

Z.B. (Mother) appeals orders entered at a permanency plan and selection hearing held under Welfare and Institutions Code[1] section 366.26. Mother contends the court erred when it found the beneficial parent/child relationship exception did not apply and terminated her parental rights to her daughters J.S. and C.S. We conclude the trial court's determination is supported by substantial evidence and affirm the orders.

I

FACTUAL AND PROCEDURAL BACKGROUND

A. Prior Dependency Proceedings

J.S. was born in January 2009. In October 2009 the San Diego County Health and Human Services Agency (Agency) filed a section 300, subdivision (b), petition on behalf of J.S. and her three older siblings, S.D. (then age 11), Julia (then age 8), and Jack (then age 5). The petition alleged Mother (1) had an alcohol problem[2] that resulted in neglect to her children, including leaving the children unattended and on one occasion leaving J.S. alone face down on the floor; and (2) did not provide a suitable home because her home was in a filthy condition, did not have electricity or running water, was insect ridden, and had limited food. At the detention hearing, the court made a prima facie finding that J.S. and her siblings were children described by section 300, and placed them in the home of Shannon M. (a maternal aunt), with whom they had lived on and off for

_____

1     All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

2     Mother admitted she drank 24 ounces of malt liquor per day, and began consuming alcohol at age 9.

many years. The court ordered that Mother be provided supervised visitation.[3] Several weeks later, the court also granted Mother's request for a drug court order, although she subsequently failed to appear at a drug court hearing and a bench warrant was issued for her arrest.

In December 2009 Mother submitted on the alcohol/neglect allegation, and the court sustained the petition. Mother was ordered to comply with a reunification plan mandating she attend counseling, a domestic violence program, parenting classes, a substance abuse program through the Family Recovery Center (Family Recovery), and attend drug court. J.S.'s placement (along with her older siblings) remained with the maternal aunt.

Mother, then pregnant with C.S., entered Family Recovery in February 2010, and C.S. resided with Mother at Family Recovery after she was born in July 2010. At the six-month review hearing in June 2010 the court found Mother had not made substantial progress on her reunification plan, and set a 12-month review hearing.

In November 2010, Mother was permitted to move from Family Recovery into transitional housing. At that time, there was a substantiated "general neglect" referral as to C.S., but C.S. was permitted to continue residing with Mother under a family maintenance case starting in December 2010. Around the same time, in J.S.'s case, the court ordered that Mother receive another six months of reunification services; shortly thereafter, J.S. began a 60-day extended visit in Mother's home. In March 2011 the court

---

[3] During one of the initial supervised visits, Mother was visibly intoxicated when she came to visit. She then also took J.S. away from the caretaker's home without the caretaker's permission, resulting in a confrontation when Mother later returned with J.S.

ordered J.S. returned to Mother's care with services, although her siblings remained placed with the maternal aunt.

Because of the lack of progress in improving Mother's relationship with the two oldest siblings, S.D. and Julia, the Agency recommended the court set a section 366.26 hearing for them. S.D. did not trust Mother and did not want to visit her because she believed Mother knew of S.D.'s sexual abuse by a relative, and Julia was uncomfortable when Mother took them to visit the home of a man who had previously had a violent and bloody altercation with Mother.

By the end of 2011, the family maintenance case involving C.S. had ended and, by March 2012, Mother had completed substance abuse treatment and drug court, achieved 26 months of sobriety, and completed a domestic violence treatment program. Jack had also been returned to Mother's care, and was thriving. Agency recommended the court should terminate jurisdiction over Jack and J.S., and in March 2012 the court entered a termination order.

B. The Current 2012 Dependency Proceedings For J.S. and C.S.

In late April 2012, the court terminated Mother's parental rights as to S.D. and Julia.[4] Two weeks later, Agency filed a new section 300 petition as to Jack, J.S. and C.S. The petition alleged that, on May 7, 2012, the staff of Jack's school found Mother smelling of alcohol and passed out in her car when she drove to the school to pick him up. J.S. and C.S. were with her in the car. The detention report also stated the car was " 'disgusting' with trash in it," the children were dirty and wearing dirty clothing, Jack had

---

[4]    The maternal aunt and uncle subsequently adopted S.D. and Julia.

4

11 absences and 16 tardies during that school year, and came to school "dirty and smelling bad." The report also stated Mother admitted she drank before driving to school that day, had been struggling with sobriety, and had not remained in contact with her support group. The court made a prima facie finding on the petitions as to these three children, removed them from Mother's custody and placed them in foster care.

The reports prepared for the jurisdictional/dispositional hearing recommended, in view of her past history, that Mother not receive reunification services. The report stated Mother had re-enrolled in outpatient treatment at Family Recovery, where she had received therapy over the last 18 months. The report noted J.S. was biting other children in the foster home where she had been placed with C.S., possibly attributable to the complex trauma she had sustained, and Jack similarly was experiencing symptoms possibly attributable to such trauma, but C.S. did not display any concerning behaviors.

At a September 2012 hearing, the court sustained the petitions as to J.S. and C.S., declared them dependents in foster care, and denied reunification services to Mother. The court scheduled a section 366.26 hearing as to C.S. for January 2013, but ordered reunification services as to J.S. for J.S.'s father. Jack was placed in the maternal aunt's home in October 2012. C.S. and J.S. were subsequently placed with the maternal aunt and uncle in January 2013, reuniting all of Mother's children under one roof.

C. The Assessment Report and Addenda for C.S.

In the assessment report prepared by assessment social worker Ms. Jankowski for consideration at C.S.'s January 2013 section 366.26 hearing, the Agency recommended the court find C.S. adoptable and terminate Mother's parental rights. The report noted

5

that, although Mother stated she had been sober for the preceding seven months, other reports stated she had relapsed at least as early as May 2012 and possibly much earlier. Mother's alcoholism, which made her incapable of providing adequate care for her children, was the primary reason Mother's other children had also been removed from her care.

Because C.S. was adoptable and had prospects (including the maternal aunt who had an approved adoption home study and wanted to adopt C.S.) making it likely she would be adopted, the report examined Mother's visitations and relationship with C.S. before ultimately recommending the court find the circumstances listed in section 366.26, subdivision (c)(1)(B),[5] did not exist that would make termination of Mother's parental rights detrimental.

Mother's supervised visits with C.S. occurred twice a week, and Jankowski's initial report stated she observed eight of those visits. On one occasion, when Jankowski picked C.S. up to take her for a visit and told her they were going to visit her "mom," C.S. asked "Shannon?"--the name of the maternal aunt. On two other occasions, when Jankowski picked C.S. up and told her they were going to visit her mom, C.S. asked "cookie?" because Mother ordinarily brought sweet treats for the girls. C.S. displays excitement at the beginning of the visits and will be clingy, but then wants to get down and will ask for food. During most visits, C.S. separated easily from Mother and showed no negative reaction to Mother leaving, but on a couple of occasions she whined or cried when

---

[5]    An exception to termination of parental rights exists when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)

separating. In contrast, at the end of visits by the maternal aunt, C.S. cried when separating from the maternal aunt. Jankowski concluded C.S. seemed more attached to the maternal aunt and, at the ends of visits, had more difficulty separating from her than from Mother.

In two subsequent addenda for C.S., prepared for an April 2013 hearing, Jankowski reported Mother maintained consistent visitation and contact with C.S. In the visits supervised by Jankowski, C.S. would be excited about the visit and would ask about the cookies or french fries she would get from Mother during visits, and on arriving C.S. would ask to be held by Mother but would then quickly turn her attention to the food Mother brought. She did not cry or become upset when separating from Mother and responded positively on learning she was returning to Shannon's (the maternal aunt's) home and was very comfortable with and affectionate toward the maternal aunt. In a late March 2013 visit with Mother, C.S. (accompanied by J.S.) was excited to see Mother but, when Shannon arrived about 20 minutes before the end of the visit, the two girls were also excited to see Shannon, and both sought attention and affection from Shannon during that visit. At the end of the visit, when Mother was carrying her to the car, C.S. said "I want Shannon." Jankowski also reported that, in visits with the caregivers in June 2013, they expressed the opinion that Mother was again drinking alcohol, and relayed information suggesting Mother had been drinking on at least four occasions between January and June 2013.

D. <u>The Assessment Report and Addenda for J.S.</u>

In J.S.'s assessment report, prepared by Jankowski for consideration at a July 2013 section 366.26 hearing for J.S.,[6] the Agency recommended the court find it was likely J.S. would be adopted if parental rights were terminated and it was in J.S.'s best interests to terminate Mother's parental rights. Because J.S. was adoptable and had prospects (including the maternal aunt who had an approved adoption home study and wanted to adopt her along with C.S.) making it likely she would be adopted, the report examined Mother's visitations and relationship with J.S. J.S. looked to Mother for her needs during visits, but J.S. relied on Shannon for her needs the majority of the time, and easily separated from Mother at the end of visits. J.S. appeared attached to Shannon, and had more difficulty separating from Shannon than from Mother. Jankowski concluded J.S.'s relationship with Mother did not outweigh the benefits of adoption, because J.S. would achieve stability, permanency, and would be able to maintain her relationships with her siblings in the adoptive home, and Mother's alcohol problem (which caused substantial trauma to J.S.'s eldest siblings) appeared to have resurfaced.[7]

---

[6]   J.S. was originally on a different track from C.S. because, although no further reunification services were ordered for Mother, reunification services had been ordered as to J.S. for her father. However, at the six-month review hearing, the Agency recommended the court terminate those reunification services and, in March 2013, the court ordered termination of reunification services for her father and set a section 366.26 hearing for J.S. for July 2013. The section 366.26 hearings for both J.S. and C.S. were heard in the same proceedings.

[7]   During the section 366.26 hearing, which occurred over several months, there were new reports of Mother drinking during the summer and fall of 2013.

E. <u>The Ruling</u>

The court found, by clear and convincing evidence, that it was likely J.S. and C.S. would be adopted if parental rights were terminated. The court also found that, although Mother had a good relationship with them, J.S. and C.S. looked to the maternal aunt and uncle as their parents. The court, after noting the children "certainly must be weary of this process and need a stable place to be," observed the "biggest thing of all" was Mother was still dealing with alcoholism, which degrades her ability to be an effective parent, and until she could control her alcohol problem her ability to be a parent is attenuated. Based on all of the factors, the court concluded the section 366.26, subdivision (c)(1)(B)(i), exception did not apply, because there was no compelling reason to conclude that terminating Mother's parental rights would harm the children to the extent adoption was not in the children's best interests.

Accordingly, the court ordered that Mother's parental rights be terminated and the children be referred for adoptive placement. Mother timely appealed.

II

EVALUATION

Mother contends the court erred when it terminated her parental rights because she had a beneficial parent-child relationship with J.S. and C.S., and the court's conclusion the section 366.26, subdivision (c)(1)(B)(i), exception did not apply was not supported by the evidence.[8]

---

8     Mother also contends that, although there were over 300 pages of Monitored Visitation Notes (the Notes) entered into evidence chronicling her visits with the

9

A. <u>Applicable Principles</u>

At a section 366.26 hearing, the court may select one of three permanency plans: adoption, guardianship or long-term foster care. (*In re Taya C*. (1991) 2 Cal.App.4th 1, 7.) There is a strong preference for adoption over alternative permanency plans. (*San Diego County Dept. of Social Services v. Superior Court* (1996) 13 Cal.4th 882, 888; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 808-809.) If the court determines the child is likely to be adopted, the burden shifts to the parent to show termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343-1345.)

An exception to termination of parental rights exists when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) " '[B]enefit from continuing the . . . relationship' " means "the [parent/child] relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a

---

children, there is no indication the court reviewed any of the Notes before reaching its conclusions. However, the Notes were submitted as part of Mother's petition under section 388 arguing there were changed circumstances warranting return of the children to her custody or, in the alternative, for reunification services. The court conducted an evidentiary hearing on Mother's section 388 petition, and received those documents into evidence, when it evaluated her section 388 petition. The court then immediately turned to the section 366.26 hearing. Under these circumstances, we presume the court considered all relevant evidence when it evaluated the issues presented by the section 366.26 hearing. (Cf. *In re Julian R.* (2009) 47 Cal.4th 487, 498-499 [rejecting claim that silent record indicated court failed to comply with statutory duty to consider whether facts and circumstances might warrant shorter confinement period because judgment or order of lower court is *presumed correct* as to matters on which the record is silent and applying general rule that a trial court is presumed to have been aware of and followed the applicable law].)

10

permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).) The exception does not require proof the child has a "primary attachment" to the parent or the parent has maintained day-to-day contact with the child. (*In re S.B.* (2008) 164 Cal.App.4th 289, 299; *In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534-1538; *In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

Where the parent has continued regular visits and contacts with the child, and the child has maintained or developed a significant, positive, emotional attachment to the parent, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H., supra*, 27 Cal.App.4th at p. 575.)

When determining whether there is substantial evidence to support the court's ruling, we review the evidence most favorably to the ruling and indulge all legitimate and reasonable inferences to uphold the court's ruling. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.) If there is substantial evidence supporting the court's ruling, the reviewing court must affirm the court's rejection of the exceptions to termination of parental rights under section 366.26, subdivision (c). (*Autumn H., supra,* 27 Cal.App.4th at p. 576.)

B. Analysis

Mother concedes the evidence supported the finding that J.S. and C.S. were likely to be adopted, and contends only that there was no evidence to support the court's finding

11

the beneficial parent/child relationship exception did not apply. We are unconvinced Mother has satisfied her burden on appeal of demonstrating there is no evidence of a sufficiently substantial nature to support the court's finding the beneficial parent/child relationship exception did not apply. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947; *In re Megan S.* (2002) 104 Cal.App.4th 247, 251.) To establish the beneficial parent/child relationship exception, "[t]he parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent." (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.) Moreover, even if the parent establishes both that he or she has a parental role in the child's life and that there is a significant positive emotional attachment between child and parent, the section 366.26, subdivision (c)(1)(B)(i), exception also requires the parent show the child would be "greatly harmed" by severing his or her relationship with the parent. (*Autumn H., supra,* 27 Cal.App.4th at p. 575.) This determination requires the parent establish that "the relationship between the minor and his mother was one that promoted [the child's] well-being to such a degree that it *outweighed* the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467, italics added.) Stated differently, the juvenile court must decide whether the benefits of adoption, which spring from "the security and the sense of belonging a new family would confer" (*Autumn H.,* at p. 575), outweigh the harm to the child from terminating the parent/child relationship. (*Ibid.*) The court should consider " 'the strength and quality of the . . . relationship' " (*In re Helen W.* (2007) 150 Cal.App.4th 71, 81), taking into account " '(1) the age of the child, (2) the portion of the child's life spent

12

in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs.' " (*Ibid.*)

The first element, whether Mother occupies a parental role in the child's life, requires more than "frequent and loving contact or pleasant visits." (*In re C.F., supra,* 193 Cal.App.4th at p. 555.)  Here, the court found Mother certainly had "good visitation" with J.S. and C.S. and "behaves appropriately" during those visits, and that they "enjoy her presence [and] are happy to see her."[9]  However, the court also noted that both children had spent substantial time with the aunt and uncle, during which J.S. and C.S. looked to the maternal aunt and uncle for "care and comfort, clothing, food, doing outings with them," and the children "start, over time, to identify who . . . are the adults that represent the permanent caregivers . . . and are looking toward them as the parents."  The court noted that, although J.S. and C.S. were happy to see Mother at visits, "they don't have any trouble separating [from Mother] and they are equally happy to see [the maternal aunt and uncle]," and the court therefore considered whether "the relationship between [the maternal aunt and uncle] and the child [is] as strong or stronger than that with [Mother]."  The court, when considering whether Mother occupied *a* parental role in the children's life, was not required disregard the broader question of who J.S. and C.S. viewed as occupying *the* parental role in their life, and there was substantial evidence to

---

9      These findings further undermine Mother's claim that the court ignored the Notes when making its assessment of the section 366.26, subdivision (c)(1)(B)(i), exception, because the Notes are the factual underpinnings for Mother's claim that she showed the "parental role" and "significant positive emotional attachment" elements for the exception.

support the conclusion that, although Mother occupied *a* parental role during visits, the maternal aunt and uncle occupied *the* role of parent in C.S.'s and J.S.'s day-to-day lives.[10]

On the second element, whether Mother's parental role in her two youngest children's lives "result[ed] in a significant, positive, emotional attachment between child and parent" (*In re C.F., supra,* 193 Cal.App.4th at p. 555), there was evidence Mother's visits with J.S. and C.S. were positive, but the ease with which they separated from Mother at the end of visits, especially when contrasted to the difficulty they had in separating from the maternal aunt and uncle, provided some evidence the attachment was not of such significance that severing the tie would so greatly harm them that its loss would outweigh the benefits of stability and security adoption would provide. Indeed, in an addendum filed just before the final hearing, Mr. H. (a co-owner of the preschool attended by the children) told Jankowski that it was "very difficult to get the girls to go with the visitation supervisors when they are picked up for visits [with Mother]," and J.S.

---

10    For example, Jankowski noted C.S. had a positive relationship with Mother, but "relies on [the maternal aunt and uncle] to meet her needs the majority of the time." C.S. enjoys her visits with Mother "but easily separates . . . at the end," while in contrast C.S. "seems to be more attached to the maternal aunt" and "shows more difficulty separating from the maternal aunt and has also asked for the [maternal aunt] when taking her to visit [Mother]." Similarly, Jankowski noted J.S. had a positive relationship with Mother, but "relies on [the maternal aunt and uncle] to meet her needs the majority of the time." J.S. enjoys her visits with Mother "but easily separates . . . at the end," while in contrast J.S. seems to be more "attached to the maternal aunt" and shows "more difficulty separating from the [maternal aunt] than she did after leaving a visit with [Mother]." Indeed, Jankowski noted during a period when J.S. had been in a foster home, J.S. "would ask for [the maternal aunt] when I would pick her up for a visit with [Mother]." This report can provide sufficient evidentiary support for the trial court's ruling. (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1427.)

"will run and hide." Additionally, after they returned from those visits, J.S. and C.S. "will tear up any art work that they completed with [Mother] and throw it away," and J.S. began having "bathroom accidents" and struggled with rules after visits. This lack of enthusiasm toward reuniting with Mother (and disinclination to treasure mementos of those visits) provided some evidence for a trier of fact to conclude the attachment J.S. and C.S. felt toward Mother was not sufficiently substantial or positive that its loss would outweigh the benefits of security and stability provided by adoption.

The final and crucial determination is whether the benefits of adoption, including "the security and the sense of belonging a new family would confer" (*Autumn H., supra,* 27 Cal.App.4th at p. 575), outweigh the harm to the children from losing the parent/child relationship. The record contains clear evidence the maternal aunt and uncle to whom J.S. and C.S. were attached was the family likely to adopt them and that these children, who were attached to each other, would reap the benefits of staying together as well as being united with their half siblings. Moreover, the court was entitled to consider that Mother's struggles with alcohol, which resurfaced shortly after J.S. and C.S. were returned to her care and were apparently ongoing, made it unlikely they would receive effective parenting from Mother at this critical period in their lives.[11] (Cf. *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423-425 [substantial evidence supported juvenile court's

[11] Mother appears to argue that her relapse, although relevant to whether J.S. and C.S. should be returned to her care or whether it should limit Mother to supervised visits, was irrelevant to selecting a permanent plan for them. However, the court was entitled to consider whether J.S. and C.S.'s best interests were served by a plan that gave them the permanence of an adoptive placement, or whether it should select a plan that left them in "the limbo of long-term foster care" (*In re Heather B.* (1992) 9 Cal.App.4th 535, 559) to wait to see if Mother might someday conquer her addiction.

decision to terminate father's parental rights despite the "benefit" exception; on one hand, father had significant relationship with the child that he maintained during monitored visitation; on the other hand, the child had adjusted well to the foster family willing to adopt him, and there was a risk that the father, who had long history of drug abuse, would relapse].)

The court could reasonably infer the bond between Mother and J.S. and C.S., although positive, was not sufficiently strong to outweigh the benefits they would gain from adoption. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; *In re Brittany C.* (1999) 76 Cal.App.4th 847, 853-854 [when a child cannot be returned to parental custody, the child must be given every opportunity to bond with an individual who will assume the role of the parent].) There is substantial evidence to support the court's finding that the beneficial parent/child relationship exception did not apply. (§ 366.26, subd. (c)(1)(B)(i).)

## DISPOSITION

The orders are affirmed.


McDONALD, J.

WE CONCUR:


NARES, Acting P. J.


IRION, J.


16